**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STORE MASTER FUNDING XXIX, LLC,** *Plaintiff,* | § | |
| **v.** | § | **CASE NO. 4:23-cv-1194** |
| **TRIANGLE CAPITAL PROPERTIES, LLC, and ROYAL TEXAS, LLC,** *Defendants.* | § | |
| **TRIANGLE CAPITAL PROPERTIES, LLC,** *Counter-Plaintiff and Third-Party Plaintiff,* | § | |
| **v.** | § | |
| **STORE MASTER FUNDING XXIX, LLC, STORE CAPITAL, LLC F/K/A STORE CAPITAL CORPORATION, CAJUN OPERATING COMPANY and CHURCH'S HOUSTON HOLDINGS, LLC,** *Counter-Defendant and Third-Party Defendants.* | § | |

**MEMORANDUM AND ORDER**

Currently before the Court is Plaintiff and Counter-Defendant STORE Master Funding XXIX, LLC, and Third-Party Defendant STORE Capital, LLC's Motion for Summary Judgment (ECF No. 96) and Plaintiff's Request for Judicial Notice in Support of Motion for Summary

Judgment (ECF No. 98). On January 16, 2025, United States Magistrate Judge Dena Hanovice Palermo issued a Report and Recommendation ("R & R") recommending that the summary motion be granted in part and denied in part. ECF No. 104. Magistrate Judge Palermo also recommended that the request for judicial notice be granted in part and denied in part. Plaintiff and Counter-Defendant STORE Master XXIX, LLC and Third-Party Defendant STORE Capital, LLC filed their objections on January 30, 2026. ECF No. 106. Defendants Triangle Capital Properties, LLC ("Triangle") and Royal Texas, LLC ("Royal") responded to the other parties' objections on February 13, 2026, but they did not raise any objections of their own. ECF No. 107. The Court has conducted a de novo review of the portions of the R & R to which STORE XXIX and STORE Capital have objected.[1] The Court declines to adopt the R&R in full and explains its reasoning as follows.

## I. BACKGROUND

This case arises from a contract dispute. The record is clear on nearly all relevant facts. STORE Master VIII, LLC ("STORE VIII")—a predecessor in interest to Plaintiff STORE Master XXIX ("STORE XXIX")—entered into a Master Lease Agreement ("Master Lease") with Defendant Triangle Capital Properties, LLC ("Triangle") in 2016. ECF No. 96 at 2.[2] Defendant Royal Texas, LLC, executed an Unconditional Guaranty of Payment and Performance ("Guaranty") by which it committed to serving as guarantor of Triangle's obligations under the Master Lease. *Id.* The Master Lease covered 24 rental properties and required Triangle to pay one-twelfth of the annual rent for the properties on a monthly basis. *Id.* Royal had previously contracted with Cajun Global, LLC ("Cajun") to obtain a Church's Chicken franchise, and Triangle operated Church's Chicken restaurants in each of the 24 locations. *Id.* at 2-3. Cajun purported to terminate

[1] The Court has reviewed the remaining sections of the R&R for clear error.
[2] The initial lease term extended through 2032. ECF No. 97 – Ex. 1 at 2.

its franchise agreement with Royal on approximately March 21, 2022. *Id.* at 3. State court litigation ensued. *Id.* At a hearing the following month, Royal and Cajun entered into a Temporary Injunction which required Royal to cease operating its Church's Chicken franchise during the pendency of the suit. ECF No. 19 – Ex. C. The Church's Chicken restaurants located in the 24 properties subject to the Master Lease closed their doors. ECF No. 96 at 3.[3]

Triangle immediately began communicating with STORE VIII about the possibility of renovating at least some of the 24 locations to house a new restaurant concept, 7Pie® Pizza ("7Pie"). *Id.* at 4. STORE VIII demonstrated interest in the proposed conversions and asked for additional information regarding Triangle's plans, which Triangle provided in detail. *See* ECF No. 102 at 5-6; ECF No. 102 – Ex. 4. STORE VIII knew that completing the renovations could potentially cost millions of dollars. ECF No. 102 at 7.

Triangle and 7Pie began renovations on several properties without expressly informing STORE VIII. ECF No. 96 at 4. They invested significant money in these projects.[4] ECF No. 102 at 7. According to a STORE executive, STORE VIII learned of the renovations in August of 2022, by which time construction at two of the properties was already complete. ECF No. 96 at 4-5. STORE VIII never expressed any opposition or concern regarding the conversions, instead asking Triangle for updates on the buildouts in September, October, and November. *See* ECF No. 96 at

---

[3] Triangle's failure to "occupy the Properties and . . . diligently operate its business on the Properties constituted a default under the lease agreement between Triangle and STORE Master VIII. *See* ECF No. 97 – Ex. 1 at §§ 8.01, 12.01(f). However, STORE Master VIII did not issue a notice of default when the Church's Chicken restaurants closed.

Triangle may also have breached the Master Lease by losing its franchise agreement with Church's Chicken. *See* ECF No. 97 – Ex. 1 at §§ 8.01, 8.04, 12.01(j). STORE Master VIII did not issue a notice of default with regard to the franchise operation.

[4] The Master Leave permitted renovations of the properties only with STORE VIII's consent, and it required Triangle to cover the costs (including for permanent improvements which would outlast Triangle's tenancy). ECF No. 97 – Ex. 1 at § 7.02. Triangle's failure to obtain permission before beginning the renovations amounted to a default under the Master Lease, but STORE VIII did not initially pursue default on these grounds. It seeks summary judgment based on Triangle's failure to pay rent, as opposed to any claims stemming from Triangle's failure to obtain permission for the renovations.

5; ECF No. 102 at 12.

Cajun informed STORE VIII that it planned to terminate its franchise agreement with Royal several days before it notified Royal of its decision. ECF No. 102 at 4. Beginning in June of 2022, attorneys for STORE VIII began speaking with attorneys for Cajun about the possibility of establishing a new lease for the 24 properties covered by STORE VIII's existing Master Lease with Triangle. *Id.* at 8-10. These discussions began in June of 2022. *Id.* at 10. Triangle was not aware of the conversations between Cajun and STORE Master VIII. *Id.* at 9-10. However, at some point in the fall, Cajun requested that Triangle assign 19 of the 24 locations to Cajun so that it could reopen them as Church's Chicken restaurants. ECF No. 97 – Ex. 14. According to Triangle, Cajun soon reversed course and "refuse[d]" to negotiate. *Id.*

Triangle paid rent for all 24 properties through November of 2022, but it failed to pay rent for any of the properties in December. ECF No. 96 at 5. STORE VIII reached out to Triangle regarding its nonpayment. *Id.* In early January, Triangle responded via letter that it was unable to use the unoccupied properties and thus could not pay its rent obligations. ECF No. 97 – Ex. 14. By that time, four of the 24 locations were fully renovated and had opened as 7Pie restaurants. *See id.* at 2. Triangle asked STORE VIII to refrain from seeking rent pending resolution of the lawsuit concerning the Triangle-Cajun franchise agreement. *Id.* Triangle also claimed that STORE VIII had refused to amend the Master Lease to permit Triangle to operate 7Pie restaurants in the leased locations. *Id.* Triangle argued that this might be related to "interference" by Cajun. *Id.*

STORE VIII sent a Notice of Event of Default and Demand for Possession to Triangle on January 12, 2023. ECF No. 97 – Ex. 15. Approximately two weeks later, STORE VIII assigned "its estate right, title, and interest in the Lease and the Guaranty" to STORE XXIX. ECF No. 96 at 6.

In February of 2023, Triangle communicated with STORE XXIX about a potential lease "breakout" whereby Triangle would pay rent for six of the 24 properties covered by the Master Lease.[5] *See* ECF No. 96 at 6. An email chain suggests that STORE XXIX and Triangle orally agreed to the breakout but did not agree on a price term—STORE XXIX suggested a $36,000 monthly rate for six locations, while Triangle suggested $30,000. ECF No. 97 – Ex. 13 at 4.[6] Triangle based its number on the proportion of locations that would remain covered by the new agreement as compared to the total value of the existing Master Lease covering 24 locations. *See id.* In the same email, Triangle stated that "[a]dditionally, there needs to be an agreement in place with respect to those 6 locations in order for 7 Pie to pay the rent. Once the agreement is executed[,] the funds can be wired promptly." *Id.* The parties never agreed to a new price term, and STORE XXIX notified Triangle that it had decided against the proposed breakout. *Id.* at 2-3. Triangle followed up to say that it would be willing to rent or purchase the four fully renovated properties instead. *Id.* at 2. To this Court's knowledge, STORE XXIX never responded.

In March of 2023, STORE XXIX sent a second Notice of Default and Demand for Possession to Triangle, and STORE XXIX took possession of the properties two days later. ECF No. 96 at 7; ECF No. 97 – Ex. 8. STORE XXIX took some steps to market the availability of its properties following the second Notice of Default. ECF No. 96 at 8. Specifically, STORE XXIX claims to have "marketed twenty three (23) of the twenty four (24) Properties for lease and sale to its national network of nearly 600 third-party brokers" and "listed five of the Properties on CoStar." ECF No. 96 at 8. However, it never placed the properties on the market through a public listing or

[5] The Master Lease did not contemplate breakouts; it self-described as "an unseverable, unitary and single lease of all, but not less than all, of the Properties . . . ." ECF No. 97 – Ex. 1 at § 17.04

[6] The email exchange occurred between Steve Neuroth (Triangle) and Michael Volk (STORE Capital). *See* ECF No. 97 – Ex. 13. Volk stated, "Steve, per your conversation w/ Lyena, for the 6 sites, please wire $36k/mo for Dec/Jan/Feb = $108,000 in total." *Id.* Neuroth responded, "Michale, do you and or Lyena have time to discuss this morning? That allocation seems high, 6/24 would be closer to $30k/mo. . . ." *Id.*

marketed the properties individually. ECF No. 107 at 17. Additionally, STORE XXIX received "one-off[s]" requests to lease several locations, but it declined the offers because it preferred to keep all of the properties together under the same lease contract and because it viewed Cajun as "a better credit risk". ECF No. 102 at 18; ECF No. 107 at 18-19 (citing ECF No. 102 – Ex. 13 at 9, 33).

STORE XXIX eventually re-leased all 24 properties to Cajun. *Id.* There was a nine-month delay between when Triangle was ordered to leave the premises and when STORE XXIX executed the replacement lease, *see id.* at 7-8, and a six-month delay between when Triangle fully evacuated the premises and the execution of the replacement lease, ECF No. 102 at 15-16.[7] Under the new agreement, STORE XXIX charged Cajun less than it had charged Triangle under the Master Lease—Cajun agreed to pay $7,182,972.78 for January of 2024 onward, as opposed to the $13,027,903.45 Triangle had committed to paying for the same period (a 44.86% reduction). *See* ECF No. 96 at 8. STORE XXIX did not actively maintain or improve the properties during the period when they were unoccupied. *See* ECF No. 102 at 50:7-14, 175:14-176:21 According to a STORE XXIX executive, the properties' condition decreased their rental value. *Id.* In addition to re-leasing the properties, STORE XIXX subsequently sold three of the locations for a combined $2,163,826.46. ECF No. 96 at 9. In total, STORE XXIX mitigated its damages by $9,346,799.24. *Id.*

Prior to the filing of this lawsuit, 7Pie assigned "any and all claims and causes of action for recovery of damages against any person or entity in connection with the development, renovation and construction, operation, lost profits, and destruction of business" of the 7Pie locations to Triangle. ECF No. 102 – Ex. 12.

[7] STORE XXIX terminated Triangle's lease on December 31, 2023. ECF No. 97-19.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment under Rule 56 "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). A genuine issue as to a material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all "reasonable inferences . . . in favor of the nonmoving party, but the nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.'" *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (quoting *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007)). "[T]he movant bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues on which the movant bears the burden of proof at trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995). "For any matter on which the non-movant would bear the burden of proof at trial, however, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* at 718–19.

## III. REQUEST FOR JUDICIAL NOTICE

Plaintiff requested that the Court take judicial notice of (1) Defendants' answers in this case; (2) the April 11, 2022, temporary injunction entered by the 125th District Court of Harris County, Texas; (3) discovery responses; (4) an assignment of causes of action dated July 31, 2024; (5) a redline comparison of Triangle's amended counterclaims; and (6) deposition transcript

excerpts. Magistrate Judge Palermo recommended that the Court take notice of Defendants' answers and decline to take notice of the other documents. No party objected to this recommendation. Accordingly, and having reviewed the recommendation for clear error, the Court adopts the reasoning of the R&R and takes notice of Defendants' answers. The STORE entities' request for judicial notice is therefore **GRANTED IN PART.**

## IV. SUMMARY JUDGMENT ANALYSIS

Plaintiff STORE Master XXIX and Counter-Defendant STORE Capital have moved for summary judgment on a number of issues which fall into three categories: STORE Master XXIX's affirmative claims; Triangle and Royal's defenses, and Triangle and Royal's counterclaims/third-party claims against STORE XXIX and STORE Capital. Where the R& R recommended granting summary judgment for STORE Master XXIX, Defendants do not object. Having reviewed those conclusions for clear error pursuant to Federal Rule of Civil Procedure 72(b), Court adopts the R&R's undisputed recommendations to **GRANT** summary judgment for STORE XXIX on Triangle and Royal's affirmative defenses of impossibility[8] and payment,[9] as well as Defendant Triangle's counterclaim for unjust enrichment.[10] The Court considers all other issues de novo.

### *A. Breach of the Master Lease*

STORE XXIX seeks summary judgment establishing that Triangle breached the Master

---

[8] As the R&R discusses,

> Texas recognizes impossibility in three situations: (1) death or incapacity of a person necessary for performance; (2) destruction or deterioration of something necessary for performance; and (3) an intervening change in the law preventing performance. *Imperial Charters, LLC v. Redwood Fire & Cas. Ins. Co.*, No. 02-24- 000237-CV, 2025 WL 1006279, at *4 (Tex. App.—Fort Worth Apr. 3, 2025, pet denied) (citing *Zemos Logistics, LLC v. BKT Enters.*, No. 02-23-0049-CV, 2023 WL 8467374, at *5 (Tex. App—Fort Worth Dec 7, 2023, no pet.) (quoting *Philips v. McNease*, 467 S.W.3d 688, 695–96 (Tex. App.—Houston [14th Dist.] 2015, no pet.))). There is no evidence of any of those situations here.

ECF No. 104 at 21.

[9] "Defendants' failure to offer any evidence [of payment] means they have not met their burden to defeat summary judgment." ECF No. 104 at 22.

[10] "[T]here is no independent cause of action for unjust enrichment in Texas." ECF No. 104 at 33.

Lease. Having considered the briefing and oral argument of Parties, the Court declines to adopt the reasoning of the R&R on this issue and instead **GRANTS** summary judgment for STORE XXIX.

Under Texas law, "[t]he elements of a claim for breach of a lease or contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from the breach. *Bagby 3015, LLC v. Bagby House, LLC*, 674 S.W.3d 609, 621 (Tex. App. – Houston, 2023, no pet.). Here, each of these elements is met as to the original, unmodified Master Lease. No party disputes the fact that there was a valid contract governing the 24-property lease; that STORE VIII/XXIX carried out its obligations by making the properties covered by the lease available to Triangle per the terms contained in the lease; that Triangle stopped paying rent in December of 2022 and did not pay rent from that point forward; and that STORE VIII/XXIX suffered damages in the form of lost rent. The question thus becomes whether the original Master Lease was modified through a formal contract modification or partial performance.

The statute of frauds applies to real estate contracts where the duration of the lease exceeds one year. Tex. Bus. & Com. Code Ann. § 26.01(b)(5). Accordingly, any material modification to such a contract is only valid where there is a signed writing. *Michael v. Busby*, 139 Tex. 278, 283 (Tex. 1942) ("It is the rule in this State, and the rule generally, that parties to a written agreement coming within the provisions of the statute of frauds may not, by mere oral agreement, alter or change one or more of the terms thereof, and thus make a new contract, resting partly in writing and partly in parol."). Texas courts have determined that emails between parties can satisfy the statute of frauds in some circumstances—namely, where the emails "otherwise meet the requirements for a contract." *Z2Z Cap., LLC v. Matthew & Riley Rose, LLC*, No. 02-22-00513-

CV, 2024 WL 1792420, at *3 (Tex. App. – Fort Worth, 2024); *see Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 669, 669 n.2-3 (Tex. 2020) (recognizing that emails can qualify as "writings" sufficient to satisfy the statute of frauds). This means that an email exchange must include "all . . . essential terms with 'a reasonable degree of certainty and definiteness.'" *Id.* "Essential terms 'are those that the parties would consider "vitally important ingredients" to their agreement and are determined on a case-by-case basis.'" *Id.* (quoting *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016)). Price is generally considered an essential term and thus may not be "left for future negotiation." *See Meridien Hotels, Inc. v. LHO Fin. P'ship I, L.P.*, 255 S.W.3d 807, 817 (Tex. App. – Dallas, 2008, no pet.); *see City of Houston v. Williams*, 353 S.W.3d 128, 138-39 (Tex. 1011). However, it need not be explicitly defined "if the agreement contains a standard for determining the purchase price."[11] *Meridien Hotels*, 225 S.W.3d at 817.

Triangle and Royal argue that a February conversation between Parties about a potential breakout of six properties from the Master Lease demonstrates a question of fact as to whether the original lease was modified. But the Court is unable to discern from that exchange—which was partially memorialized via email—what modification Triangle and Royal are asking the Court to enforce. *See Fiduciary Fin. Servs. of Sw., Inc. v. Corilant Fin.*, L.P., 376 S.W.3d 253, 258 (Tex. App. – Dallas, 2012) (An agreement which "is not definite and specific as to material and essential terms is . . . unenforceable."). The parties proposed different price terms, and they did not agree to any formula for calculating rent. Additionally, they did not come to an agreement regarding what would happen to the 18 properties not included in the breakout, nor how long any new arrangement would last. Finally, Triangle twice noted that there was no amended lease agreement in place—

[11] Here, the contract concerned real property as opposed to services. King v. Baylor University, 46 F. 4th 344, 360 n.12 (5th Cir. 2022) is therefore inapposite.

first when it stated that Triangle would need an agreement before executing payments and, second, when it stated that 7Pie would pay past due rents once an agreement was completed.[12] Given the lack of specificity in Parties' email exchange, it is clear that no formal contract modification occurred.

Triangle and Royal next observe that partial performance can provide an exception to the statute of frauds. *See, e.g., Stovall & Assocs., P.C. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 801 (Tex. App. – Dallas, 2013, no pet.) They contend that their investment in converting several of the properties into 7Pie restaurants amounted to partial performance on an amended lease agreement covering those locations. However, partial performance cannot render an agreement which lacks essential terms enforceable unless the performance itself "suppl[ies] the key to what was promised." *Elizondo v. Gomez*, 957 S.W.2d 862, 864 (Tex. App. – San Antonio, 1997, pet. denied). There was no defined agreement between Parties in the instant case, and Triangle's renovations do not shed light on the missing terms of the allegedly modified contract.[13] Thus, there is nothing for this Court to enforce. What is more, Triangle and Royal began renovating the restaurant locations *before* attempting to enter into a binding lease modification with STORE VIII. The Court does not see how Triangle could partially perform on a contract that was not yet under negotiation. Finally, partial performance only stands in for a signed writing where the performance in question was "unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App. – Dallas, 2002). Triangle undertook its renovations while still paying full rent on all 24 properties, consistent with

---

[12] After the six-property lease breakout fell through, Triangle followed up that it would be willing to rent or purchase four of the locations instead. This suggests that Parties did not reach a firm agreement on the number of properties to be leased through a modified agreement, either.

[13] The Court also notes that Triangle did not pay rent on *any* locations—including the renovated locations—starting in December of 2022. This also undermines Triangle's assertion of partial performance, since Triangle indisputably would have had to pay some amount of rent under a modified lease agreement.

its obligations under the Master Lease.[14] Because Triangle's performance could plausibly be referred to the Master Lease, it is not "unequivocably referable" to some new agreement.

Because the Court finds that no formal modification of the Master Lease occurred and partial performance does not otherwise support a lease modification, the Court concludes that Triangle breached its Master Lease with STORE XXIX and **GRANTS** summary judgment for STORE XXIX on this issue.

### *B. Breach of the Guaranty*

STORE XXIX next seeks summary judgment establishing that Royal breached its Guaranty of the Master Lease. Having considered the briefing and oral argument of Parties, the Court **GRANTS** summary judgment for STORE XXIX on its breach of Guaranty claim.

To establish a breach of guaranty in Texas, a "plaintiff must prove (1) the existence and ownership of the guaranty contract; (2) the terms of the underlying contract by the holder; (3) the occurrence of those conditions the plaintiff bases liability on; and (4) the guarantor's failure or refusal to perform as promised." *Cadence Bank v. Burns, Burns & Burns LLC*, No. 4:24-CV-3040, 2025 WL 1735526, at *3 (S.D. Tex. June 23, 2025) (Ellison, J.) (*quoting Harrison Co., L.L.C. v. A-Z Wholesalers, Inc.*, 44 F.4th 342, 346–47 (5th Cir. 2022)). Here, it is undisputed that a guaranty contract exists; that Royal guaranteed Triangle's Master Lease with STORE VIII; that Triangle failed to pay rent as required by the Master Lease; and that Royal did not execute rental payments in Triangle's stead as required by the Guaranty. The sole point of contention is whether STORE XXIX owns the Guaranty as STORE VIII's successor in interest.

---

[14] Parties disagree as to whether the Master Lease permitted Triangle to operate other franchises within the leased properties or whether Triangle could only operate Church's Chicken restaurants at those locations. The implication is that, if the Master Lease restricted Triangle to operating Church's Chicken restaurants, Triangle's decision to convert certain properties into 7Pie restaurants could not have related to the Master Lease. *See* ECF No. 91 – Ex. 1 at §§ 8.01, 8.04, 12.01(j). The Court disagrees with this perspective. Assuming without deciding that the Master Lease required Triangle to maintain its franchise with Church's Chicken, Triangle failure to do so would amount to a breach. But, even such a breach would not itself invalidate the Master Lease or remove Parties from its ambit.

More specifically, Royal argues that STORE XXIX may not enforce the Guaranty against it because of a provision in the Guaranty agreement which provides:

> Guarantor acknowledges and agrees that (a) Lessor may collaterally assign all of its right, title and interest under the Lease and this Guaranty to a lender . . . Guarantor hereby consents to, and no further consent by Guarantor shall be required for, any further assignment of rights of Lessor hereunder or in connection with any transfer by Lessor.

ECF No. 97-2 at ¶ 13. Royal contends that because STORE XXIX is not a lender, STORE VIII was not within its authority to transfer the Guaranty to STORE XXIX. This argument misses the mark. As described in the R&R,

> "Lessor" includes both Store Master Funding VIII, LLC and its successor, STORE. *See id.* The Lessor may assign its rights to a lender but is not limited to assigning those rights only to a lender. The evidence establishes that STORE is the Lessor's successor in interest on the Guaranty. ECF No. 97-16 at 2 ("STORE MASTER FUNDING VIII, LLC . . . assigns and transfers to STORE MASTER FUNDING XXIX, LLC . . . the guaranty of the Lease delivered by Royal Texas LLC"). Thus, STORE is the Guaranty's owner. *See Dubier as Tr. of Pamela Joy Dubier 2011 Revocable Tr. v. Triangle Capital Props.*, LLC, 736 F. Supp. 3d 487, 500–01 (E.D. Tex. 2024) (interpreting an identical guaranty provision and reaching the same conclusion against Triangle). Royal also consented to "any further assignment of rights . . . in any connection with any transfer by Lessor" in the Guaranty. ECF No. 97-2 at 2. Therefore, STORE is the owner of the Guaranty. *Dubier*, 736 F. Supp. 3d at 500–01.

ECF No. 104 at 16.

The Court agrees that STORE XXIX owns the Guaranty and may enforce it against Royal. Accordingly, the Court **GRANTS** summary judgment for STORE XXIX on the issue of breach of Guaranty.

### *C. Waiver of Payment*

STORE XXIX seeks summary judgment that it did not waive its right to payment under the original lease agreement. Triangle and Royal have presented no evidence suggesting that STORE XXIX waived its right to receive rent. Accordingly, the Court declines to adopt the

reasoning of the R&R on this issue **GRANTS** summary judgment for STORE XXIX.[15]

### *D. Mitigation of Damages*

STORE XXIX also seeks summary judgment that it properly mitigated its damages. Having considered the briefing and oral argument from Parties, the Court **DENIES** summary judgment for STORE XXIX on this issue.

In Texas, a "plaintiff must mitigate its damages if it can do so with 'trifling expense or with reasonable exertions." *Park Ten Invs., LLC v. First Serv. Credit Union*, 2022 WL 17038106 *7 (Tex.App.—Houston [14th Dist.] 2022, no pet.) (internal citations omitted). Whether or not a plaintiff properly mitigated its damages is generally a question of fact for the jury. *See Hygeia Dairy Co. v. Gonzalez*, 994 S.W.2d 220, 224 (Tex. App. – San Antonio, 1999). The majority of Texas courts of appeals have determined that a defendant claiming failure to mitigate bears the burden of proof to demonstrate both the *fact* of failure to mitigate and the *amount* of damages which could have been mitigated were it not for that for that failure *See, e.g., Kartsosis v. Bloch*, 503 S.W.3d 506 (Tex. App. – Dallas 2016, pet. denied); *but see Hygeia Dairy Co.*, 994 S.W.2d at 226 (requiring only "some evidence in the record from which the jury can make a reasoned calculation about losses from failure to mitigate."). For purposes of this Motion, the proper inquiry is whether Triangle and Royal have provided sufficient evidence to enable a jury to find that STORE XXIX failed to mitigate and to allow the jury to determine the impact of any such deficiency. Triangle and Royal have presented evidence that STORE XXIX chose not to market the defaulted properties as widely as it could have; did not invest resources to keep the properties maintained and desirable; preferred to work with Cajun to establish a new lease despite a delay in

---

[15] The R&R assumed that STORE XXIX sought a ruling establishing that it had not waived its right to consent to Triangle's renovations of the leased properties. *See* ECF No. 104 at 17-19, 19 n.6. STORE XXIX subsequently clarified that it only intended to seek summary judgment on Triangle and Royal's defense of "waiver" as the defense applied to waiver of rental payments. ECF No. 106 at 15.

the execution of that lease; and ultimately charged Cajun significantly less than it charged Triangle for the properties. The Court concludes that there is a question of fact as to whether STORE XXIX complied with its duty to mitigate. It also concludes that Triangle has produced enough evidence regarding the amount by which damages could have been reduced to survive summary judgment—namely, the time the property sat idle while STORE XXIX negotiated with Cajun and the difference between the rental payments assessed against Triangle and against Cajun. For these reasons, the Court **DENIES** summary judgment for STORE XXIX on the issue of mitigation.

***E. Triangle's Breach of Contract Counterclaim***

STORE XXIX and STORE Capital seek summary judgment on Triangle's breach of contract counterclaim alleging that the STORE XXIX and STORE Capital breached their contract with Triangle by failing to abide by the terms of a modified lease agreement between the entities. However, in Section A above, the Court concluded that there was no contract modification and no partial performance. For this reason, the Court **GRANTS** summary judgment for STORE XXIX and STORE Capital on these issues.

***F. Triangle's Quantum Meruit Counterclaim***

The STORE entities seek summary judgment on Triangle's quantum meruit counterclaim. The Court **GRANTS** summary judgment on this issue.

Texas law provides that a party may seek damages through quantum meruit where "(1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) those services and materials were accepted by the person sought to be charged, and were used and enjoyed by him; and (4) the person sought to be charged was reasonably notified that the plaintiff performing such services or furnishing such materials was expecting to be paid by the person sought to be charged." *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732 (Tex. 2018).

However, "[a] party generally cannot recover under a quantum-meruit claim when there is a valid contract covering the services or materials furnished." *Id.* at 733.

Triangle has alleged that it "provided valuable service, materials and renovations to 7Pie® Renovation Locations. These services and materials were provided to the locations owned by STORE[,] and STORE accepted the services and materials and the resulting upgrade of these locations, either for its own benefit or, as is now known, its new tenant Cajun." ECF No. 85 at 16. But, consistent with the Court's conclusion that Triangle breached the Master Lease agreement, the Master Lease remained in effect and governed the Parties' relationship during the period when the renovations occurred.

Additionally, the Court finds that Triangle has not furnished evidence that the STORE entities or Cajun have benefitted from—or even used—the renovations that Triangle facilitated and which 7Pie paid for. Similarly, Triangle has not shown that the STORE entities were "notified" that Triangle had an expectation it would be paid for the renovations. For these reasons, the Court **GRANTS** summary judgment for the STORE entities.

***G. Triangle's Promissory Estoppel Counterclaim***

STORE XXIX and STORE Capital seek summary judgment on Triangle's promissory estoppel counterclaim, which alleges that Triangle detrimentally relied on the STORE entities' "promises and representations" that they would allow a lease breakout covering the six properties that were in the process of being converted into 7Pie locations. To succeed on a promissory estoppel claim, a party must show "(1) a promise; (2) foreseeability of reliance thereon by the promisor; and (3) substantial reliance by the promisee to his detriment.") (emphasis removed). *See Davis v. Texas Farm Bureau Insurance*, 470 S.W.3d 97, 107 (Tex. App. – Houston, 2015). As with quantum meruit claims, "when a valid, express contract covers the subject matter

of the parties' dispute, there can be no recovery under a quasi-contract theory. That is because parties should be bound by their express agreements." *TIB- The Independent BankersBank v. Canyon Community Bank*, 13 F. Supp.3d 661, 671 (N.D. Tex. 2014); *Doctors Hosp. 1997, L.P. v. Sambuca Houston, L.P.*, 13 F. Supp.3d 661, 636 (Tex. App – Houston, 2015) (collecting cases to demonstrate that "[f]or many years, Texas courts have held that promissory estoppel becomes available to a claimant only in the *absence* of a valid and enforceable contract").

Here, the Master Lease was in place and governed the relationship between Parties during the period when the 7Pie renovations occurred. Moreover, Triangle does not identify a clear promise on the part of STORE VIII which supports a lease breakout. Triangle can point to communications in which STORE VIII ratified the ongoing renovations and requested progress updates, but these occurred while Triangle was still paying full rent for the 24 properties. While Triangle might have believed it would be allowed to operate the converted stores moving forward regardless of whether it could pay rent on the other locations, STORE VIII never promised as much. For these reasons, the Court **GRANTS** summary judgment for the STORE entities on this issue.

### *H. Triangle's Fraud, Conspiracy to Commit Fraud, Statutory Fraud, and Negligent Misrepresentation Counterclaims*

The STORE entities ask the Court to grant summary judgment on Triangle's fraud, conspiracy to commit fraud, statutory fraud, and negligent misrepresentation counterclaims. The Court concludes that summary judgment for the STORE entities is appropriate.

To prevail on a fraud claim in Texas, a plaintiff must show "(1) a material misrepresentation; (2) made with knowledge of its falsity or asserted without knowledge of its truth; (3) made with the intention that it should be acted on by the other party; (4) which the other

party relied on; and (5) which caused injury." *Scheidler v. Essentia Ins. Co*., No. 4:23-CV-2985, 2025 WL 1397068, at *3 (S.D. Tex. May 14, 2025) (citing *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018)). Surviving summary judgment on a fraud claim requires the plaintiff to identify the "who, what, when, and where" of the alleged fraud. *Fric v. Allstate Life Ins. Co*., 664 F. Supp. 3d 756, 769 (S.D. Tex. 2023). A statutory fraud claim involving a real estate transaction has the same elements, "except that there is no required proof of knowledge or recklessness as a prerequisite to the actual damages." *WFG Nat'l Title Ins. Co. v. Kavac Holding Co.,* LLC, No. 4:18-CV-368, 2019 WL 636722, at *8 (S.D. Tex. Jan. 22, 2019), adopted, No. 4:18-CV-00368, 2019 WL 632754 (S.D. Tex. Feb. 14, 2019) (internal quotations omitted).

Importantly, fraud and statutory fraud both require evidence of an affirmative misrepresentation. By contrast, an entity may commit fraud by nondisclosure when it has an duty to disclose information and fails to do so. Such a duty

> may arise in four circumstances: (1) where there is a fiduciary or confidential relationship between the parties; (2) where a person voluntarily discloses information, he must disclose the whole truth; (3) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression . . . .
>
> Where a duty to disclose exists, the elements of fraud by nondisclosure are (1) a party conceals or fails to disclose a material fact within the knowledge of that party; (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

*In re Enron Corp. Sec., Derivative & "ERISA" Litig*., 490 F. Supp. 2d 784, 794 (S.D. Tex. 2007) (Ellison, J.) (internal citations omitted).

In addition to fraud claims, negligent misrepresentation claims are available to plaintiffs who can show

> (1) [a] representation is made by a defendant in the course of his business, or in a

> transaction in which he has a pecuniary interest; (2) the defendant supplies false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*Oaks v. Maraboyina*, No. 3:23-CV-2833-X, 2025 WL 418743, at *4 (N.D. Tex. Feb. 6, 2025). Such claims can arise from either an affirmative misrepresentation or—in circumstances where a party has a duty to disclose—from nondisclosure. *Fleming v. Texas Coastal Bank of Pasadena*, 67 S.W.3d 459, 461 (Tex. App. – Houston, 2002) (within the context of a fraud by misrepresentation claim, a duty to disclose arises in "confidential or fiduciary relationships" and where "a party makes a partial disclosure that, although true, conveys a false impression").

Here, Triangle argues that the STORE entities made "promises and representations" to Triangle regarding the use of the leased property for 7Pie locations and failed to "disclose material facts of which it had knowledge," including "its lack of intent to perform the promises and representations it had made." ECF No. 102 at 35. Triangle takes particular issue with the fact that the STORE entities began conversations with Cajun about leasing all 24 properties while Triangle was undertaking the process of converting several of those properties into 7Pie locations. However, Triangle presented no evidence of any concrete or affirmative misrepresentation on the part of the STORE entities. Moreover, the evidence suggests that during the period when the renovations were underway, the STORE entities did not yet know that they would not ultimately continue some form of lease with Triangle (either the original Master Lease, which Triangle paid in full through December of 2022, or a lease breakout such as the one that Parties subsequently attempted to negotiate).

While the R&R addressed fraud by nondisclosure and misrepresentation by nondisclosure, the STORE entities are correct in noting that Triangle did not expressly raise

these counterclaims. *See generally* ECF No. 85. Accordingly, they are not part of the case. Even if Triangle had pled fraud by nondisclosure or fraud by misrepresentation, there is no evidence that the STORE entities had a fiduciary or confidential relationship with Triangle establishing a duty to disclose their future planning. Likewise, the STORE entities never made any affirmative representations or partial disclosures which would create such a duty.

For the reasons above, Triangle may not sustain its fraud, statutory fraud, or negligent malpresentation claims against the STORE entities. The Court **GRANTS** summary judgment for STORE XXIX and STORE Capital on these issues.

***I. Triangle's Entitlement to Damages and STORE Capital's Liability***

Finally, the STORE entities seek summary judgment establishing that Triangle is not entitled to damages because the damages which Triangle claims as a result of the STORE entities' actions were instead incurred by 7Pie. ECF No. 96 at 17. While 7Pie assigned all of its rights to sue to Triangle, the STORE entities argue that 7Pie lacked a contractual relationship with the STORE entities and therefore had no right to sue them. *Id.* The STORE entities also seek summary judgment establishing that STORE Capital is not liable to Triangle because STORE Capital and STORE XXIX are separate corporations, and there is no factual basis for STORE Capital's liability other than its "parent-subsidiary relationship with STORE XXIX. *Id.* at 15-16 Because the Court concluded that each of Triangle's counterclaims fails for independent reasons, it need not address either issue.

## VI. CONCLUSION

For the reasons described above, the Court **GRANTS** summary judgment for Plaintiff on its claims for breach of Master Lease and breach of Guaranty. It also grants summary judgment for Plaintiff on Defendants' waiver of payment, payment, payment, and impossibility defenses.

The Court **GRANTS** summary judgment for the STORE entities on Defendants' counterclaims for unjust enrichment, breach of contract, promissory estoppel, quantum meruit, fraud, conspiracy to commit fraud, statutory fraud, and negligent representation. The Court **DENIES** summary judgment for Plaintiff on Defendants' mitigation of damages defense.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 4th day of August, 2026.

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE